OPINION
In June 1993, appellee, Jane Doe,[1] began working in one of two health and exercise clubs owned by appellant, Doe Corporation; she worked first as a day care attendant and then as a receptionist. In mid October 1994 (approximately sixteen months later), Jane quit. In August 1995, she filed suit against appellant seeking compensatory and punitive damages for claims of sexual harassment in the workplace.
At trial, Jane testified that one of the two male co-general managers, Marcus Cervetto, and at least three of the male program directors ("salesmen") had acted and spoken in sexually offensive ways to her and other women who worked as receptionists and day care attendants. The salesmen's actions included: positioning themselves between appellee's legs and then pressing their bodies up against her, pinning her against the counter area, asking her to show her breasts, grabbing her breast and genital areas, commenting to her on the large size of their own genitals, bringing in sexually offensive cartoons, and attempting to get her to watch a pornographic videotape. Jane said that the manager would jokingly ask the women to perform certain sex acts, call himself the "Mac Daddy" and refer to the women as his "little hookers." Additionally, appellee stated that Cervetto also would grab at her breasts and her buttocks. In early October, when a new manager was being shown around the club, Jane said that Cervetto walked over to her, pulled her hair and indicated to the new manager that "he could do anything he wanted" to her.
Jane testified that, although she did not like the men's comments and actions, she would usually just laugh and try to walk away. She stated that she did not quit immediately because she had recently purchased a car and needed to make the car payments. In addition, she said she did not tell her father because she was afraid he would get angry and do something to the men. She also did not tell her uncle, who worked as a maintenance manager for appellant, because she was afraid of what he might do. She worried that he might lose his job if he went after the men. In addition, she knew that another woman employee who had complained was fired two weeks later.
Jane stated that she considered Cervetto to be her immediate supervisor because he always scheduled her work hours and assigned her job duties. Jane considered two other people, Jeff Winke, the area supervisor, and Robin Cox, another higher level supervisor, to be the "head managers"; they, however, were never involved in her day-to-day supervision or administered disciplinary actions.
In October 1994, after being reprimanded by the manager for being late and falling asleep at work one Sunday morning, Jane quit. Several days later, she suffered a mental breakdown and was hospitalized. In March 1994, she had begun to work a second job with a television cable company. However, she remained depressed, could not concentrate on her work, and frequently cried. She also feared that someone had poisoned her food and that Cervetto and one of the salesmen were "after her." She experienced flashbacks of the sexual harassment incidents.
After talking with the employee counselor, Jane sought further treatment. In early January 1995, Jane was diagnosed as suffering from post traumatic stress disorder ("PTSD") as well as thought and mood disorders — a schizoaffective condition. While undergoing separate but concurrent treatment from a psychologist and a psychiatrist, Jane recalled sexual abuse incidents from her childhood involving an older cousin. She also acknowledged that she had been upset by the change in management at the health club and other personal events in her life. Nevertheless, Jane stated that the sexual harassment triggered both the PTSD and her psychosis.
Over appellant's objections, two other women co-workers also testified as to incidents of sexual harassment. Kelly Kopeny-Szachury testified that she began working at the health club in August 1993, as a receptionist and day care attendant. She testified that when the two co-general managers would be absent from the building, one of the salesmen would temporarily be put in charge of the club. Kelly noted that she seldom saw Jeff Winke or Robin Cox, whose offices were at the other health club location. She also stated that at the time she was hired, she never received a written sexual harassment policy, nor was she told how to report harassment should it occur. Kelly stated that Cervetto, whom she considered to be her immediate supervisor, would call the women demeaning names like "whore", "bitch," and "slut." One of the salesman who was sometimes left in charge of the club, Griffin Keitzman, would use offensive language and engage in "grabbing" behavior. Kelly stated that the salesmen would sometimes pin the women against the receptionist stand or chair, or against a wall in the break room area and request sexual favors or "talk nasty" to them. The salesmen would also put their hands on the women's thighs, or would begin to rub the women's shoulders and then slip their hands down to grab the women's breasts. Kelly sometimes worked with Jane and testified that she had witnessed Cervetto and some of the salesmen do these things to Jane as well.
At a January 1994 meeting of all the receptionists and day care workers, Kelly informed the area supervisor Jeff Winke of the abusive language and grabbing behavior. She specifically informed him that she had not complained to Cervetto since he was one of the perpetrators. Winke assured her that he would address the problem. After that, Kelly acknowledged that the behavior improved. However, two weeks later, Cervetto called her into his office and said that someone had complained about her supervision of children in the day care. He then said that he had to terminate her employment or the club would be subjected to a lawsuit. Kelly testified that she did not recall any complaint made at the time of the alleged incident and no written report or complaint was ever shown to her.
Kelly also noted that Jane's demeanor had changed dramatically from when she first met her at the club. Kelly observed that Jane, who had been very outgoing and participated in various sports, became much less aggressive and no longer engaged in sports or social activities.
The second woman employee witness, Kellie Jackson, worked at the health club from mid August 1993 to early November 1993; she was hired by Cervetto. She testified that Cervetto, while observing attractive women customers, would say that he would like to "stick his fingers up the girls' butts." Cervetto would also make demeaning and offensive comments about women customers, describing their exercise clothing as "butt floss." Kellie also corroborated Cervetto's use of the term "Mac Daddy" and that the women employees were his "girls." Cervetto would often employ a sexy, whispering voice when asking her to pick up lunch for him. Kellie testified that Cervetto continued this behavior over her specific objections.
Kellie also stated that Keitzman, one of the salesman, would tell "dirty" jokes in front of her, despite his knowledge and her protests that she did not want to hear them. She acknowledged, however, that she had dated him for about three weeks and that the harassment behavior took place after that time. Kellie stated that five or six times he and other salesmen slipped sexually suggestive cartoons into her paperwork so that she would see them by accident. She testified that Cervetto and Keitzman would also block her way out of the break room, making sexual comments as to what she had to do in order to leave. Kellie said that she did not know who Robin Cox was and that she considered Cervetto to be her manager or immediate supervisor. Kellie also noted that, although she herself never made a formal complaint, she and Kelly Kopeny-Szachury had discussed the sexual harassment issues.
Jane's father testified that prior to her employment at the health club, she had never had problems with his daughter. He stated that Jane had lots of friends, enjoyed working with him on their Corvette cars, played with her dogs, and played sports. However, since the breakdown, Jane does not engage in any of those activities. At the time of trial, Jane had also been off work for about two months. During that time, her father had taken a leave of absence from his own job to stay with her because she is fearful of being left alone. Her father described her as a totally different person lacking all "spirit" or drive. Jane's father also noted that several months prior to her breakdown, Jane had expressed a desire to quit her job. At her mother's reminder that she had a car payment to make, however, she agreed not to quit. Both Jane's father and her uncle, the maintenance manager at the health club, acknowledged that she had never told them about the harassment.
Jane's two therapists also testified. Dr. Vivian Kemeny, a clinical psychologist, diagnosed and treated Jane for post traumatic stress disorder. Jane told her she was having problems because of sexual harassment by coworkers. Dr. Kemeny observed that Jane had exhibited many of the criteria for PTSD, including: 1) exposure to a traumatic event; 2) reexperiencing that event through distressing memories or nightmares; 3)intense psychological distress (crying, deep depression, anxiety, deep sadness, nervousness) when exposed to things that resemble or symbolize an aspect of the traumatic event; 3)avoidance of stimuli associated with the trauma and numbing of general responsiveness; 4) avoiding thoughts, feelings or conversations associated with the trauma; 5) avoiding people or activities that remind of the trauma; 6) markedly diminished interest or participation in significant activities; 7) feeling of detachment from others; 8) restricted range of emotions (inability to laugh or feel happy); 9) worry of shortened life span; 10) irritability or outbursts of anger; 11) difficulty concentrating; 12) hyper vigilance; and 13) exaggerated startle response.
Dr. Kemeny treated Jane from January 1995 through April or May 1995 for PTSD. She opined that, to a reasonable degree of psychological probability, Jane's PTSD was caused by the sexual harassment at the health club.
Dr. Kettlie Daniels, appellee's psychiatrist, testified that she diagnosed Jane as having "schizoaffective" thought and mood disorders, also known as psychotic disorders. According to her hospital records, Dr. Daniels testified that when Jane was admitted to the hospital, she had appeared very agitated and delusional. However, several weeks later when she began therapy with Dr. Daniels and was on medication, Jane no longer appeared delusional. At the beginning of her treatment, Jane reported that she was having difficulties because she had been sexually harassed by coworkers. Dr. Daniels described her as being very paranoid and fearful, often worrying that her food had been poisoned or that her coworkers were trying to sabotage her car. The doctor noted that Jane, who had no previous history of mental problems, was unemotional or "flat" in her reactions. During her therapy sessions, Jane also revealed that the sexual harassment had triggered memories of childhood sexual molestation by a female cousin.
In Dr. Daniels' opinion, the onset of the mood and thought disorders was precipitated by the sexual harassment experiences. Dr. Daniels testified that a person can simultaneously have PTSD and thought disorders and be treated separately for the two disorders. She acknowledged that, unlike PTSD, the schizoaffective disorder is something that could manifest itself even without a stressor. However, in Dr. Daniel's opinion, Jane's schizoaffective disorder was triggered or accelerated by the sexual harassment trauma.
At the close of appellee's case, appellant moved for a directed verdict as to liability and punitive damages, which the trial court denied. Appellant then called various witnesses in its defense. Marcus Cervetto, the general manager of the health club, and the three salesmen all testified that they had no authority over appellee. The salesmen acknowledged that they sometimes used profanities, but denied that it was ever directed at anyone. They each denied that they had ever sexually harassed any women employees; all testified that they had received and knew about the sexual harassment policy implemented in an employee handbook that was distributed in February 1994.
Cervetto also acknowledged that he had disciplined Jane at various times regarding her work duties. He, however, denied that he had any authority over her, stating that Robin Cox or Jeff Winke were Jane's immediate supervisors. Cervetto also recalled that in the summer of 1994, Jeff Winke had advised him and his salesmen to curb their profanity, which they did. Cervetto indicated that because he was good friends with Kellie Jackson and her fiance, he had never made any lewd or obscene comments to her. He further indicated that Winke had never told him about any complaints by Kelly Kopeny-Szachury concerning his or the salesmen's alleged inappropriate behavior or comments.
Cervetto admitted that he had falsely indicated on his job application that he had two years of college, even though he had never actually attended the college listed. Cervetto also admitted that at trial he recalled more about his employment than he had been able to remember at a deposition one week earlier.
Jeff Winke, the area supervisor for both health clubs, testified that he had been employed by Doe Corporation from December 1990 to September 1994. From 1991 to June 1994, he ran both Toledo clubs; he was then promoted to area supervisor. Winke stated that he resigned in September 1994, when new management demoted him to general manager. He currently works as a supervisor at car dealership where he hired Marcus Cervetto as one of his salesmen.
Winke stated that the co-general managers reported to him to confirm final decisions on hiring, firing, disciplinary actions, or training. However, he acknowledged that Cervetto, as a general manager, ran the club on a day-to day basis, including the scheduling, direction, and disciplining of day care attendants and receptionists.
Winke stated that in February 1994, he held a meeting with all the receptionists and day car workers to discuss the new employee handbook. He recalled that Kelly Kopeny-Szachury had complained that the salesmen abused the women, used foul language, were too impatient and demanded too much. Winke did not recall that Kelly specifically complained about sexual harassment. However, he testified that he later met with the general managers and salesmen about their language and their treatment of the women. He specifically testified to going over the sexual harassment policy in the new employee handbook.
Winke stated that he had terminated Kelly because she had been "lax in her duties as a day care attendant," not because of her harassment complaint. However, Winke acknowledged that there was no documentation of the member's complaint, no written memorandum or writeup procedure followed, and no written documentation of Kelly's termination. Winke admitted that it was Cervetto who had informed Kelly that she was fired.
Appellant's two regional directors of human resources, Robert Cady and Janice Cahill, also testified. They both stated that appellant had a sexual harassment policy which was enforced. Cady testified that he had been in charge of sexual harassment training and handling harassment complaints from November 1992 to June 1994. In outlining Ohio's chain of command, he stated that there are area directors who are located in Akron. Below them are area supervisors who were directly in charge of the clubs in a given location. Below them is a general manager or co-managers for each club. The general managers are in charge of service and sales, as well as the day-to day running of the club. He testified that Jeff Winke had attended sexual harassment training sessions in February 1993 and February 1994. Cady stated that he had never investigated any sexual harassment complaints in the Toledo area. He testified that in 1992 and 1993, the general managers were only responsible for sales and were not the supervisors for receptionists or day care workers.
Cahill testified that since June 1994, she has handled the sexual harassment training for the Ohio area. Cahill stated that she spends approximately seventy percent of her time investigating sexual harassment complaints and doing training. She stated that she reviews two to three complaints each month, especially from receptionists and day care attendants. She noted that it was currently the company's policy for any supervisor with knowledge of a sexual harassment complaint to report it to the area director who would then refer it to her. According to Cahill, although there is no phone number listed for either her office or the area office in Akron, Ohio, an employee would know how to reach her to register a complaint.
Dr. Thomas Sherman, a psychiatrist, testified that he had reviewed appellee's treatment records and her deposition; in addition, he had met with her for one two-hour session. He stated that although Jane initially appeared anxious, she had cooperated with him during the interview and answered his questions honestly. Dr. Sherman agreed that sexual abuse would be a stressor sufficient enough to cause PTSD. He also acknowledged that PTSD and a psychotic mental illness could occur simultaneously.
Essentially, Dr. Sherman agreed that Jane suffers from a serious mental illness and does not disagree with Dr. Daniels' diagnosis and treatment. However, in Dr. Sherman's opinion, although Jane's mental illness could have been accelerated by the sexual harassment, it was difficult to make such an absolute determination since no exclusive evidence exists that stress causes psychotic disorders.
The jury found appellant liable for appellee's injuries caused by the sexual harassment, awarding $100,000 in compensatory damages and $1,000,000 in punitives. Appellant then moved for judgment notwithstanding the verdict and/or remittitur of the jury award, which the trial court denied.
Appellant now appeals, setting forth the following five assignments of error:
 "I. THE LOWER COURT ERRED IN DENYING DEFENDANTS' MOTIONS FOR DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
 "II. THE LOWER COURT ABUSED ITS DISCRETION IN ADMITTING THE TESTIMONY OF KELLY KOPENY-SZACHURY AND KELLY JACKSON.
 "III. THE LOWER COURT ERRED IN DENYING DEFENDANTS' MOTION FOR NEW TRIAL AND/OR FOR REMITTITUR.
 "IV. THE LOWER COURT ERRED IN ITS CHARGE TO THE JURY ON THE ELEMENTS FOR PLAINTIFF'S ALLEGED `COMMON LAW' CLAIM OF SEXUAL HARASSMENT."
 I.
We will first address appellant's fourth assignment of error in which it contests the trial court's jury instructions that define appellee's common law sexual harassment claim.
An employer "has a duty to provide its employees with a safe work environment." Kerans v. Porter Paint Co. (1991),61 Ohio St.3d 486, 493. In Kerans, the Supreme Court of Ohio recognized the common law tort of sexual harassment in addition to state and federal statutory schemes for such actions. Id. However, except for a brief reference in the dissent's footnote, the Kerans case did not delineate the elements for such a claim.[2]
The Kerans case noted that the common law tort of sexual harassment permitted the recovery for purely psychological claims, unlike Ohio or federal statutory claims. Id. at 495. Referring to the test of strict intent required for employer intentional torts, the court also stated that it
 "would contravene [Ohio's strong public policy against workplace sexual harassment] to force victims of sexual harassment to prove that their claims meet a strict test devised as an exception to a remedial scheme which fails to provide victims of sexual harassment with a true remedy." Id.
However, in the absence of a clearer delineation of the elements for a common law claim of sexual harassment by the Supreme Court of Ohio, we are constrained to consider the interpretations of other Ohio courts of appeal.
Where a common law claim for sexual harassment has been alleged, Ohio courts have chosen to adopt the same elements required under federal Title VII sexual harassment actions. SeeBarney v. Chi Chi's, Inc. (1992), 84 Ohio App.3d 40; Thompson v.Western Auto Supply Co. (May 8, 1996), Delaware App. No. 95 CA-E-05-030, unreported. These elements are: (1) the employee was a member of the protected class; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment had the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile or offensive work environment; and (5) the existence of respondeat superior liability.Scandinavian Health Spa, Inc. v. Ohio Civ. Rights Comm. (1990),64 Ohio App.3d 480, 489; Rabidue v. Osceola Refining Co. (C.A. 6, 1986), 805 F.2d 611, 619, cert. denied (1987), 481 U.S. 1041.
Under the doctrine of respondeat superior, an employer may be held liable for sexual harassment of employees "by supervisory personnel, whether or not employer knew, should have known, or approved of the supervisor's actions." Meritor SavingsBank v. Vinson (1986), 477 U.S. 57, 70-71. See also Davis v.Black (1991), 70 Ohio App.3d 359, 366 (despite lack of notice or approval of sexual harassment, employer is liable for actions of supervisor who acts with authority given by employer);Western-Southern Life Ins. Co. v. Fridley (1990), 69 Ohio App.3d 190,194 (liability may be found where employer has not developed complaint procedures or failed to react under existing procedures upon allegations of sexual harassment); Scandinavian Health Spa,Inc., supra.
In this case, the trial court gave the following jury instructions as to the elements required to establish a common law claim for sexual harassment:
 "one, the alleged conduct must be conduct which would not occur but for the sex of the employee or conduct that is sexual in nature;
"two, the sexual conduct must be unwelcomed;
 "three, that there was a duty owed to plaintiff by her employer to provide her with a work place environment free of sexual harassment;
 "four, that the employer violated this duty because either, A, the harassment of the plaintiff was carried out by her supervisor, or, B, the employer knew of the harassment but failed to take appropriate remedial action;
"five, that the plaintiff suffered damages, and
 "six, that these damages were proximately caused by the violation of the defendant's duty."
The trial court also explained the following terms relevant to the jury's understanding of the elements: "duty," "breach of duty," "proximate cause," "damages," "employer liability," "hostile or offensive work environment," "unwelcome," and "severe and pervasive."
When viewed within the context of the entire set of instructions, we conclude that the jury instructions, while worded somewhat differently, essentially included the elements of a claim for common law sexual harassment as delineated under recent federal and state case law.
Accordingly, appellant's fourth assignment of error is not well-taken.
 II.
Appellant, in its first assignment of error, contests the trial court's denial of its motions for directed verdict and judgment notwithstanding the verdict. Appellant contends that a directed verdict should have been granted as to the issues of liability and punitive damages.
The standard for granting a directed verdict and JNOV are the same. Mantua Mfg. Co. v. Commerce Exchange Bank (1996),75 Ohio St.3d 1, 4. Such motions will be granted only when
 "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *." Civ.R. 50(A)(4)
When construing the evidence, uncertainty as to the existence of damages precludes recovery by a claimant, but uncertainty as to the amount does not. Pietz v. Toledo Trust Co. (1989), 63 Ohio App.3d 17,22. Since weight of the evidence and credibility of the witnesses are determined by the trier of fact, the trial court may not consider such matters on motions for directed verdict or JNOV. Gladon v. Greater Cleveland Regional Transit. Auth. (1996),75 Ohio St.3d 312, 318.
Appellee provided testimony and evidence in support of her claim and appellant's liability for her damages. Testimony was presented that certain sexual comments and physical grabbing had taken place on a regular basis by male employees and a general manager. Despite appellant's assertion that the general manager was not appellee's direct supervisor, evidence was presented that he did in fact have a great deal of control over her employment, thus establishing evidence of respondeat superior liability. Therefore, evidence was presented from which reasonable minds could find that appellant, in fact, knew of the behavior or shouldhave known, since one of the alleged perpetrators was appellee's manager who had a significant measure of authority over her.
In addition, punitive damages may be awarded to punish and deter a defendant from certain conduct. Moskovitz v. Mt.Sinai Med. Ctr. (1994), 69 Ohio St.3d 638, 651. Actual malice necessary for an award of punitive damages, is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Cabe v. Lunich (1994),70 Ohio St.3d 598, paragraph one of the syllabus.
In this case, evidence was presented as to appellant's alleged knowledge of the harassing behavior and its liability for the damage caused by it. Again, construing the facts in appellee's favor, evidence was presented from which reasonable minds could find that appellant (through the respondeat superior
acts of its manager) acted with ill will or a conscious disregard for the rights of appellee and that there was a great probability of substantial harm. Therefore, we conclude that the trial court properly denied appellant's motions for directed verdict and for JNOV.
Accordingly, appellant's first assignment of error is found not well-taken.
 III.
Appellant, in its second assignment of error, argues that the lower court abused its discretion in admitting into evidence the testimony of the other women employees regarding the alleged sexual harassment they experienced.
The admission or exclusion of evidence is generally left to the discretion of the trial court. State v. Maurer (1984),15 Ohio St.3d 239, 265. All relevant evidence is admissible if its probative value outweighs the danger of unfair prejudice. Statev. Williams (1983), 4 Ohio St.3d 53, 57-58.
See also Evid.R. 403. Evidence tending to show sexual harassment of other women working beside a plaintiff is directly relevant to whether that plaintiff was subjected to a hostile working environment. See Drawl v. Cleveland Orthopedic Ctr. (1995),107 Ohio App.3d 272, 278.
In this case, the women employees who worked with appellee testified as to the working environment, the alleged sexual comments made by male employees, and appellant's knowledge of and adequacy of appellant's efforts to address the problems. They also corroborated much of appellee's testimony. Therefore, the trial court did not abuse its discretion in admitting such testimony since it was directly relevant to whether or not appellee was subjected to a hostile work environment.
Accordingly, appellant's second assignment of error is not well-taken.
 IV.
Appellant, in its third assignment of error, argues that the lower court erred in denying its motion for a new trial and/or for a remittitur.
An appellate court reviewing a motion for a new trial may reverse the trial court's judgment only if there is an abuse of discretion. Youseff v. Parr, Inc. (1990), 69 Ohio App.3d 679,690. In determining whether the trial court abused its discretion in ruling on a motion for a new trial, an appellate court considers "not whether the judge's view of the evidence differed from that of the jury, but whether that view, in the light of the totality of the evidence was clearly erroneous."
Bland v. Graves (1993), 85 Ohio App.3d 644, 651. Consequently, if a "jury verdict is supported by substantial, competent, credible evidence, it is an abuse of discretion to grant a motion for a new trial." Hancock v. Norfolk Western Ry. Co. (1987),39 Ohio App.3d 77, 81.
In addition, in the absence of prejudice, neither an appellate court nor the trial court may substitute its judgment for that of the jury in the area of damages in a personal injury case. Litchfield v. Morris (1985), 25 Ohio App.3d 42, 44. "Remittitur is only proper where a court can affirmatively find that the jury's verdict is manifestly excessive." Uebelacker v.Cincom Systems, Inc. (1992), 80 Ohio App.3d 97, 103. Moreover, a trial court's grant of a remittitur is an abuse of discretion where the basis for the court's decision represents nothing more than the court's subjective disagreement with the size of the verdict. See Betz v. Timken Mercy Med. Ctr. (1994), 96 Ohio App.3d 211,222. A jury verdict as to punitive damages which is not the result of passion and prejudice or prejudicial error will not be reduced on appeal. Villella v. Waikem Motors, Inc. (1989),45 Ohio St.3d 36, syllabus. Furthermore, a large disparity in compensatory and punitive damages, standing alone, is insufficient to justify a court's interference with the award. Id. at 40;Yackel v. Kay (1994), 95 Ohio App.3d 472, 484.
In this case, the jury's verdict depended primarily on the credibility of the witnesses. The jury heard testimony that at least three male employees and a manager had allegedly made sexual comments to and physically touched women employees including appellee, an inexperienced young woman just graduated from high school. Evidence was also presented that appellant, through its area supervisor, had knowledge of some of this behavior and had allegedly dealt with it by discussing the use of "bad language." Although the perpetrators denied committing such actions and appellant disavowed notice of any sexual harassment, these issues constitute issues of fact for the jury. In answers to interrogatories on the verdict forms, the jury specifically found that Cervetto, Keitzman, and two other salesmen had sexually harassed appellee, that appellant knew or should of known of the harassment, that appellant failed to take prompt and appropriate action, and that this failure proximately caused injury to appellee.
Upon a complete review of all the testimony, we conclude that appellee provided substantial, competent, credible evidence as to her sexual harassment claim. Therefore, we conclude that the trial court did not abuse its discretion in denying appellant's motion for a new trial.
In addition, while the award of punitives may be much greater than the compensatory award, appellant has not established that either award was manifestly excessive, especially in light of the nature of alleged harassment and its ultimate effects on appellee. Despite appellant's claim that the award is unwarranted in relationship to its net worth, the jury apparently chose to believe evidence presented that appellant has accessible assets. Thus, we cannot say that the trial court abused its discretion in denying appellant's motion for remittitur.
Accordingly, appellant's third assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellants.
JUDGMENT AFFIRMED.
Peter M. Handwork, P.J.
 Melvin L. Resnick, J.
 James R. Sherck, J.
CONCUR.
[1] Pursuant to an agreement to protect all the parties' privacy, plaintiff was designated at trial as "Jane Doe" and the defendant health club as "Doe Corporation One and Doe Corporation Two." The health club was operated under two different names due to a change in ownership from when appellee worked there and at the time of trial. To provide clarity, we will refer to both corporations as one entity, "Doe Corporation."
[2] The Kerans dissent notes that under federal law, two elements seem necessary: (1) "the alleged conduct must be conduct which would not occur but for the sex of the employee or conduct that is sexual in nature (either manifested physically or psychologically). [Citations omitted.]"; and (2) "the sexual conduct must be unwelcome. [Citations omitted.]" Kerans, supra,61 Ohio St.3d at 496, footnote 4.